## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| LES SGNILEK, Individually and On Behalf of All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) |
| ENERGY TRANSFER PARTNERS, L.P., ENERGY TRANSFER PARTNERS GP, L.P, ENERGY TRANSFER PARTNERS, L.L.C., ENERGY TRANSFER EQUITY, L.P., KELCY L. WARREN, TED COLLINS, JR., MICHAEL K. GRIMM, MARSHALL S. McCREA, JAMES R. PERRY, MATTHEW S. RAMSEY, DAVID K. SKIDMORE, SUNOCO LOGISTICS PARTNERS L.P., SUNOCO PARTNERS LLC, and ENERGY TRANSFER EQUITY, L.P., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

Civil Action No. _____

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

**JURY TRIAL DEMANDED**

Plaintiff, by his undersigned attorneys, alleges upon knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, the following.

### NATURE OF THE ACTION

1.       This is a unitholder class action brought by plaintiff on behalf of himself and the public unitholders of Energy Transfer Partners, L.P. ("ETP" or the "Partnership") against ETP, ETP's general partner, Energy Transfer Partners GP, L.P. ("ETP GP"), ETP GP's general partner, Energy Transfer Partners, L.L.C. ("ETP GP LLC") (the ETP entities are collectively referred to herein as "ETP"), ETP's Board of Directors (the "Individual Defendants" or the "Board"), Sunoco Logistics Partners L.P ("SXL"), SXL's general partner, Sunoco Partners LLC

("SXL GP"), and Energy Transfer Equity, L.P. ("ETE") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78n(a) and 78t(a), and Rules and Regulations promulgated thereunder, including Rule 14a-9, 17 C.F.R. §240.14a-9, in connection with the proposed merger of ETP with SXL Acquisition Sub LP ("Merger Sub"), a wholly owned subsidiary of SXL .

2.        On November 20, 2016, ETP announced that it had entered into an agreement and plan of merger (the "Merger Agreement") with SXL, SXL GP, ETE, and ETP GP (the "Proposed Transaction").   The Merger Agreement, which was subsequently amended on December 16, 2016, provides that unitholders of ETP will receive 1.5 common units of SXL for each common unit of ETP owned.

3.        The consideration offered to ETP unitholders was worth approximately $39.29 as of market close on November 18, 2016, the last trading day before announcement of the Proposed Transaction.   At a value of $39.29 per unit, the consideration represented a minimal 5% premium over the volume-weighted average closing price of ETP units during the five trading days prior to announcement of the Proposed Transaction.   As of January 19, 2017, however, the value of SXL's units had dropped and the consideration to be paid to ETP unitholders was worth only $35.65 per unit, *less* than the value of ETP units immediately prior to announcement of the Proposed Transaction.

4.        On December 19, 2016, defendants filed with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction a Form S-4 Registration Statement (the "Registration Statement").   In violation of sections 14(a) and 20(a) of the Exchange Act, the Registration Statement omits material information about the Proposed

Transaction, such as the significant holdings of ETP's "independent financial advisor" in SXL, ETP, and ETE and other conflicts of interest.

## JURISDICTION AND VENUE

5.       This Court has jurisdiction over the claims asserted herein pursuant to Section 27 of the Exchange Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9.

6.       This Court has jurisdiction over defendants because each defendant is either a partnership that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.       Venue is proper under 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

8.       Plaintiff owns and has owned units of ETP continuously since prior to the wrongs complained of herein.

9.       Defendant ETP is a publicly-traded limited partnership organized under the laws of Delaware.  ETP's principal executive offices are located at 8111 Westchester Drive, Suite 600, Dallas, Texas 75225.  ETP's common units trade on the NYSE exchange under the ticker "ETP."

10.       Defendant Kelcy L. Warren ("Warren") is a director, Chairman of the Board, and Chief Executive Officer ("CEO") of ETP.  Warren also serves on ETE's board of directors.

11.       Defendant Ted Collins, Jr. ("Collins") is a director of ETP.  Collins also serves on ETE's board of directors.

12.     Defendant Michael K. Grimm ("Grimm") is a director of ETP.  Grimm is Chair of both the ETP Board's Audit Committee and its Compensation Committee.

13.     Defendant Marshall S. McCrea ("McCrea") has served as a director of ETP since December 2009.  McCrea also serves on the boards of directors of SXL and ETE.  McCrea has served as Group Chief Operating Officer and Chief Commercial Officer for the ETP entities since 2015.  McCrea previously served as President and Chief Operating Officer ("COO") of ETP GP from June 2008 to November 2015 and President – Midstream from March 2007 to June 2008.  He served as Senior Vice President – Commercial Development since January 2004, and was named President of La Grange Acquisition LP, ETP's primary operating subsidiary, in March 2005.  McCrea is also a member of the board of directors of ETE.

14.     Defendant James R. Perry ("Perry") was a director of ETP and a member of the ETP Board's Audit Committee.  Perry also served on the boards of SXL and SXL GP.  Perry resigned from the boards of ETP and ETP GP, ETP GP LLC, SXL, and SXL GP on December 31, 2016.

15.     Defendant Matthew S. Ramsey ("Ramsey") is a director of ETP.  Ramsey also serves as Chairman of the Board of Sunoco LP ("SUN") and on ETE's board of directors.  He has served as President and COO of ETP GP since November 2015.

16.     Defendant David K. Skidmore ("Skidmore") is a director of ETP.  Skidmore is a member of the ETP Board's Audit Committee and the Compensation Committee.

17.     Defendant ETP GP is a Delaware limited partnership, the general partner of ETP, and a party to the Merger Agreement.

18.     Defendant ETP GP LLC is a Delaware entity and is the general partner of ETP GP.

19.     Defendant SXL is a Delaware limited partnership and a party to the Merger Agreement.

20.     Defendant SXL GP is a Pennsylvania limited liability company, the general partner of SXL, and a party to the Merger Agreement.

21.     Defendant ETE is a Delaware limited partnership and indirect parent entity of ETP, ETP GP, SXL and SXL GP.

22.     The defendants identified in ¶¶ 10-15 are collectively referred to herein as the "Individual Defendants."

## FACTUAL ALLEGATIONS

ETP, ETP GP, ETP GP LLC, ETE, SXL, SXL  GP, and SUN share management and ownership

23.     ETP, ETP GP, ETP GP LLC, ETE, SXL, SXL GP, and SUN for a complicated web of entities with numerous interlocks.

24.     ETP is a master limited partnership that owns and operates a large and diversified portfolio of energy assets.  ETP's subsidiaries include Panhandle Eastern Pipe Line Company, LP and Lone Star NGL LLC, which owns and operates natural gas liquids storage, fractionation, and transportation assets.  All told, ETP owns and operates approximately 62,500 miles of natural gas pipelines.

25.     ETP also owns SXL GP, 100% of the incentive distribution rights, and 67.1 million common units of SXL.  SXL operates a portfolio of complementary crude oil, refined products, and natural gas liquids pipeline, terminalling acquisition and marketing assets which are used to facilitate the purchase and sale of crude oil, natural gas liquids, and refined products.

26.     ETP's general partner is owned by ETE.  As alleged above, defendants Warren, Collins, McCrea, and Ramsey serve on the boards of both ETP and ETE.  Additionally, ETP's Chief Financial Officer ("CFO"), Thomas E. Long ("Long"), also serves as CFO of ETE.

27.     ETE is a master limited partnership that owns the general partner and 100% of the incentive distribution rights of ETP and SUN.  ETE also owns approximately 2.6 million ETP common units and approximately 81.0 million ETP Class H Units.  The ETE family owns and operates approximately 71,000 total miles of natural gas, natural gas liquids, refined products, and crude oil pipelines.

28.     SXL is a master limited partnership that owns and operates a logistics business consisting of a portfolio of complementary crude oil, refined products, and natural gas liquids pipeline, terminalling and acquisition and marketing assets which are used to facilitate the purchase and sale of crude oil, natural gas liquids, and refined products.

29.     SXL's general partner is a subsidiary of ETP.  Defendants McCrea and Perry serve on the boards of both ETP and SXL.

30.     SUN is a master limited partnership that operates approximately 1,340 convenience stores and retail fuel sites and distributes motor fuel to convenience stores, independent dealers, commercial customers and distributors located in 30 states at approximately 6,800 sites.

31.     SUN's general partner is owned by ETE.  Defendant Ramsey is a director of ETP and Chairman of SUN's board of directors.  Additionally, ETP's CFO, Long, also is a director of SUN.

ETP's Strong Recent Performance

32.     On May 4, 2016, ETP issued a press release announcing its first quarter 2016

financial results:

> Distributable Cash Flow, as adjusted, for the three months ended March 31, 2016
> was $349 million compared to $321 million for the three months ended March 31,
> 2015, an increase of $28 million. Distributable Cash Flow, as adjusted, per unit
> was $0.33 for the three months ended March 31, 2016, an increase of 10%
> compared to the three months ended March 31, 2015. ETE's net income
> attributable to partners was $312 million for the three months ended March 31,
> 2016 compared to $284 million for the three months ended March 31, 2015, an
> increase of $28 million.

> The Partnership's recent key accomplishments and other developments include
> the following:

> •     In March 2016, the Partnership completed a private offering of 329.3
>       million Series A Convertible Preferred Units representing limited partner
>       interests in the Partnership to certain common unitholders ("Electing
>       Unitholders") who elected to participate in a plan to forgo a portion of
>       their future potential cash distributions on common units participating in
>       the plan for a period of up to nine fiscal quarters, commencing with
>       distributions for the fiscal quarter ending March 31, 2016, and reinvest
>       those distributions in Series A Convertible Preferred Units. At the end of
>       the plan period, which is expected to be May 18, 2018, the Series A
>       Convertible Preferred Units are expected to automatically convert into 79
>       million ETE common units.

> •     In April 2016, ETE announced a $0.285 distribution per ETE common
>       unit for the quarter ended March 31, 2016, or $1.14 per unit on an
>       annualized basis.

> •     As of March 31, 2016, ETE's $1.5 billion revolving credit facility had
>       $965 million of outstanding borrowings and its leverage ratio, as defined
>       by the credit agreement, was 2.87x.

33.     On August 3, 2016, ETP issued a press release announcing its financial results for

the second quarter of 2016, which stated in part:

> •     In August 2016, ETP, Sunoco Logistics Partners L.P. ("Sunoco
>       Logistics") and Phillips 66 announced the completion of the project-level
>       financing of the Dakota Access Pipeline and Energy Transfer Crude Oil
>       Pipeline projects (collectively the "Bakken Pipeline"). The $2.50 billion

facility is anticipated to provide substantially all of the remaining capital necessary to complete the projects.

- In August 2016, ETP and Sunoco Logistics announced they have signed an agreement to sell 36.75% of the Bakken Pipeline project to MarEn Bakken Company LLC, an entity jointly owned by Enbridge Energy Partners, L.P. and Marathon Petroleum Corporation, for $2.00 billion in cash. The sale is expected to close in the third quarter of 2016, subject to certain closing conditions. ETP and Sunoco Logistics will receive $1.20 billion and $800 million in cash at closing, respectively, and will own a combined 38.25% of the Bakken Pipeline project.

- As of June 30, 2016, ETP's $3.75 billion credit facility had $1.13 billion of outstanding borrowings and its leverage ratio, as defined by the credit agreement, was 4.47x.

34.    ETP's quarterly distributions to unitholders have increase materially since 2013. While the quarterly distributions announced in 2013 were at or below $0.905 per unit per quarter, by 2014 they had climbed to $0.975 per unit per quarter.  On October 28, 2016, ETP announced a distribution of $1.055 per unit for the quarter.

35.    On November 9, 2016, ETP issued a press release announcing its financial results for the third quarter of 2016, which stated in part:

- On November 1, 2016, ETP acquired certain interests in PennTex Midstream Partners, LP ("PennTex") from various parties for total consideration of approximately $640 million in ETP units and cash.

- As of September 30, 2016, ETP's $3.75 billion credit facility had $1.58 billion of outstanding borrowings and its leverage ratio, as defined by the credit agreement, was 4.26x.

<u>Defendants Engaged in a Flawed Process Prior to Agreeing to the Proposed Transaction</u>

36.    As described in the Registration Statement, the Proposed Transaction is the result of a flawed, single-bidder process during which the Individual Defendants only held negotiations with the ETP's affiliate, SXL:

The ETP Conflicts Committee was not authorized to, and did not, conduct an auction process or other solicitation of interest from third parties for the acquisition of ETP. Given ETE's control over ETP's general partner, it was unrealistic to expect or pursue an unsolicited third party acquisition proposal or offer for the assets or control of ETP, and it was unlikely that the ETP Conflicts Committee could conduct a meaningful auction for the acquisition of the assets or control of ETP.

37.    On October 19, 2016, ETE management met with the ETP Board and the board of directors of LE GP, LLC, the general partner of ETE, to discuss the possibility of entering the Proposed Transaction.

38.    On October 31, 2016, defendant Warren, a director of ETP and the Chairman of the board of directors of LE GP, LLC, met with the President and CEO of SXL, Michael J. Hennigan ("Hennigan"), regarding the potential merger.

39.    On November 1, 2016, the boards of ETP and ETE met regarding the potential transaction, and the ETP Board created a "Conflicts Committee" comprised of defendants Skidmore and Grimm.

40.    On November 11, 2016, defendant Warren sent a letter to the SXL board stating that "ETE believed that it would be advisable for SXL to consider making a proposal to acquire ETP in an all equity transaction."  The letter further stated that ETE would be prepared to consent to transaction between SXL and ETP, so long as the transaction was beneficial to the unitholders of ETE.

41.    On November 18, 2016, SXL submitted a proposal to acquire ETP, under which ETP common unitholders would receive 1.475 SXL common units per unit of ETP.

42.    On November 19, 2016, ETP responded with a counterproposal under which ETP common unitholders would receive 1.50 SXL common units per ETP unit.  This was the extent of price negotiations prior to entering the Merger Agreement.

43.    On November 20, 2016, the boards of ETP and ETE met together.   At this meeting, the ETP Board approved the Proposed Transaction.   The parties executed the Merger Agreement that day.

44.    On November 21, 2016, ETP and SXL issued a joint press release announcing the Proposed Transaction:

> **Sunoco Logistics Partners L.P. (NYSE: SXL) and Energy Transfer Partners, L.P. (NYSE: ETP)** today announced that they have entered into a merger agreement providing for the acquisition of ETP by SXL in a unit-for-unit transaction. The transaction was approved by the boards of directors and conflicts committees of both partnerships and is expected to close in the first quarter of 2017, subject to receipt of ETP unitholder approval and other customary closing conditions.
>
> Under the terms of the transaction, ETP unitholders will receive 1.5 common units of SXL for each common unit of ETP they own. This equates to a 10% premium to the volume weighted average pricing of ETP's common units for the last 30 trading days immediately prior to the announcement of the transaction.
>
> As SXL will be the acquiring entity, the existing incentive distribution rights provisions in the SXL partnership agreement will continue to be in effect, and Energy Transfer Equity, L.P. (NYSE: ETE) will own the incentive distribution rights of SXL following the closing of the transaction. As part of this transaction, ETE has agreed to continue to provide all the incentive distribution right subsidies that are currently in effect with respect to both partnerships. The transaction is expected to be immediately accretive to SXL's distributable cash flow per common unit and is also expected to allow the combined partnership to be in position to achieve near-term distribution increases in the low double digits and a more than 1.0x distribution coverage ratio.
>
> The transaction is expected to provide significant benefits for SXL and ETP unitholders as the combined partnership will have increased scale and diversification across multiple producing basins and will have greater opportunities to more closely integrate SXL's natural gas liquids business with ETP's natural gas gathering, processing and transportation business. With this transaction, SXL and ETP expect to build upon their experience working together as partners in several joint ventures to pursue commercial opportunities and to achieve cost savings while enhancing the service capabilities for their customers. SXL and ETP expect that the transaction will allow for commercial synergies and costs savings in excess of $200 million annually by 2019.

The transaction is also expected to strengthen the balance sheet of the combined organization by utilizing cash distribution savings to reduce debt and to fund a portion of the growth capital expenditure programs of the two partnerships. ETP and SXL have spent approximately $15 billion in organic growth capital over the past several years, and these expenditures, combined with the completion of other major capital projects currently in progress, are expected to continue to generate strong distributable cash flow growth.

Both ETP and SXL management teams are pleased to be able to bring two strong partnerships together in this strategic transaction that combines the premier crude oil midstream MLP with the premier natural gas midstream MLP. The combined partnership is expected to be the second largest MLP as measured by enterprise value.

At the closing of the transaction, the Chief Executive Officer, Chief Commercial Officer, President and Chief Financial Officer of the combined partnership will be Kelcy Warren, Mackie McCrea, Matt Ramsey and Tom Long, respectively, and it is expected that Mike Hennigan and other members of the SXL management team will continue in leading management roles of the combined company with the SXL business headquartered in Philadelphia.

* * *

Latham & Watkins LLP acted as legal counsel to ETP. Vinson & Elkins LLP acted as legal counsel to SXL. Barclays acted as financial advisor and Potter Anderson & Corroon LLP acted as legal counsel to ETP's conflicts committee. Citi acted as financial advisor and Richards Layton & Finger, P.A. acted as legal counsel to SXL's conflicts committee.

45.     Between November 22, 2016 to December 8, 2016, ETP, SXL, and their counsel "had various discussions regarding alternative structures for the proposed transaction, and in particular, the structure of the GP merger."  The Registration Statement does not reveal the basis for these discussions.

46.     On December 16, 2016, the parties entered into an amended Merger Agreement.

The Merger Agreement

47.     The Individual Defendants agreed to terms that all but ensure no other entity will emerge with a competing proposal.  Section 5.3(a) of the Merger Agreement contains a "no solicitation" provision that prohibits ETP or the Individual Defendants from soliciting alternative

proposals and restricts their ability to communicate and negotiate with potential buyers who wish

to submit or have submitted unsolicited alternative proposals:

> ETP shall, and shall cause its Subsidiaries and shall use its reasonable best efforts to cause ETP's and its Subsidiaries' respective directors, officers, employees, investment bankers, financial advisors, attorneys, accountants, agents and other representatives (collectively, "Representatives") to, immediately cease and cause to be terminated any discussions or negotiations with any Person conducted heretofore with respect to an ETP Alternative Proposal, request the return or destruction of all confidential information previously provided to such parties by or on behalf of ETP or its Subsidiaries and immediately prohibit any access by any Person (other than SXL and its Representatives) to any physical or electronic data room relating to a possible ETP Alternative Proposal. Except as permitted by this Section 5.3, (x) without the prior written consent of SXL, ETP shall not, and shall cause its Subsidiaries not to, and use its reasonable best efforts to cause its Representatives not to, directly or indirectly (i) solicit, initiate, knowingly facilitate, knowingly encourage (including by way of furnishing confidential information) or knowingly induce or take any other action intended to lead to any inquiries or any proposals that constitute or could reasonably be expected to lead to an ETP Alternative Proposal, (ii) grant any waiver or release of any standstill or similar agreement with respect to any units of ETP or of any of its Subsidiaries, (iii) enter into any confidentiality agreement, merger agreement, letter of intent, agreement in principle, unit purchase agreement, asset purchase agreement or unit exchange agreement, option agreement or other similar agreement relating to an ETP Alternative Proposal (an "ETP Acquisition Agreement"), or (iv) withdraw, modify or qualify, or propose publicly to withdraw, modify or qualify, in a manner adverse to SXL, the ETP Board Recommendation or publicly recommend the approval or adoption of, or publicly approve or adopt, or propose to publicly recommend, approve or adopt, any ETP Alternative Proposal, or fail to recommend against acceptance of any tender offer or exchange offer for ETP Units within ten (10) business days after commencement of such offer, or resolving or agreeing to take any of the foregoing actions, and (y) subject to Section 5.3(b), within five business days of receipt of a written request of SXL following the receipt by ETP of any ETP Alternative Proposal, ETP shall publicly reconfirm the ETP Board Recommendation; provided, that, in the event that SXL requests such public reconfirmation of the ETP Board Recommendation, then ETP may not unreasonably withhold, delay (beyond the five business day period) or condition the public reconfirmation of the ETP Board Recommendation and provided, further, that SXL shall not be permitted to make such request on more than one occasion in respect of each ETP Alternative Proposal and each material modification to an ETP Alternative Proposal, if any (the taking of any action described in clause (x)(iii) or the failure to take the action described in clause (y) being referred to as an "ETP Adverse Recommendation Change"). Without limiting the foregoing, it is understood that any violation of the foregoing restrictions by ETP's Subsidiaries or Representatives shall be deemed to be a breach of this Section 5.3 by ETP unless such violation is committed without the Knowledge of ETP and ETP uses its reasonable best efforts to promptly cure such violation once ETP is made aware of such violation.

48.     Section 5.3(c) of the Merger Agreement requires that ETP advise SXL within twenty-four hours of any proposals or inquiries received from other parties:

> In addition to the other obligations of ETP set forth in this Section 5.3, ETP shall promptly advise SXL, orally and in writing, and in no event later than 24 hours after receipt, if any proposal, offer, inquiry or other contact is received by, any information is requested from, or any discussions or negotiations are sought to be initiated or continued with, ETP in respect of any ETP Alternative Proposal, and shall, in any such notice to SXL, indicate the identity of the Person making such proposal, offer, inquiry or other contact and the terms and conditions of any proposals or offers or the nature of any inquiries or contacts (and shall include with such notice copies of any written materials received from or on behalf of such Person relating to such proposal, offer, inquiry or request), and thereafter shall promptly keep SXL reasonably informed of all material developments affecting the status and terms of any such proposals, offers, inquiries or requests (and ETP shall promptly provide SXL with copies of any additional written materials received by ETP or that ETP has delivered to any third party making an ETP Alternative Proposal that relate to such proposals, offers, inquiries or requests) and of the status of any such discussions or negotiations.

49.     Section 5.3(d) of the Merger Agreement contains a restrictive "fiduciary out" provision that only allows the Board to withdraw its approval of the Proposed Transaction under extremely limited circumstances and grants SXL a "matching right" with respect to any "Superior Proposal" made to the Partnership:

> Notwithstanding any other provision of this Agreement, at any time prior to obtaining the ETP Unitholder Approval, the ETP Managing GP Board and the ETP Conflicts Committee may effect an ETP Adverse Recommendation Change in response to an ETP Alternative Proposal or an ETP Changed Circumstance if the ETP Managing GP Board (upon the recommendation of the ETP Conflicts Committee), after consultation with its outside legal counsel and financial advisors, determines in good faith that the failure to take such action would be inconsistent with its duties under the ETP Partnership Agreement or applicable Law and:

> (i) if the ETP Managing GP Board (upon the recommendation of the ETP Conflicts Committee) intends to effect such ETP Adverse Recommendation Change in response to an ETP Alternative Proposal:

> A. such ETP Alternative Proposal is bona fide, in writing and has not been withdrawn or abandoned;

B. the ETP Managing GP Board (upon the recommendation of the ETP Conflicts Committee) has determined, after consultation with its outside legal counsel and financial advisors, that such ETP Alternative Proposal constitutes an ETP Superior Proposal after giving effect to all of the adjustments offered by SXL pursuant to clause (E) below;

C. ETP has provided prior written notice to SXL in accordance with Section 8.9 (the "ETP Superior Proposal Notice") of the ETP Managing GP Board's intention to effect an ETP Adverse Recommendation Change, and such ETP Superior Proposal Notice has specified the identity of the Person making such ETP Alternative Proposal, the material terms and conditions of such ETP Alternative Proposal, and complete copies of any written proposal or offers (including proposed agreements) received by ETP in connection with such ETP Alternative Proposal;

D. during the period that commences on the date of delivery of the ETP Superior Proposal Notice as determined in accordance with Section 8.9 and ends at 11:59 p.m. Central time on the date that is the fifth calendar day following the date of such delivery (the "ETP Superior Proposal Notice Period"), ETP shall (1) negotiate with SXL in good faith to make such adjustments to the terms and conditions of this Agreement as would permit the ETP Managing GP Board not to effect an ETP Adverse Recommendation Change; and (2) keep SXL reasonably informed with respect to the status and changes in the material terms and conditions of such ETP Alternative Proposal or other change in circumstances related thereto; provided, however, that any material revisions to such ETP Alternative Proposal (it being agreed that any change in the purchase price in such ETP Alternative Proposal shall be deemed a material revision) shall require delivery of a subsequent ETP Superior Proposal Notice and a subsequent ETP Superior Proposal Notice Period in respect of such revised ETP Alternative Proposal, except that such subsequent ETP Superior Proposal Notice Period shall expire upon the later of (x) the end of the initial ETP Superior Proposal Notice Period and (y) 11:59 p.m. Central time on the date that is the third calendar day following the date of the delivery of such subsequent ETP Superior Proposal Notice; and

E. the ETP Managing GP Board shall have considered all revisions to the terms of this Agreement irrevocably offered in writing by SXL and, at the end of the ETP Superior Proposal Notice Period, shall have determined in good faith that (i) such ETP Alternative Proposal continues to constitute an ETP Superior Proposal even if such revisions were to be given effect and (ii) failure to effect an ETP Adverse Recommendation Change would be inconsistent with its duties under the ETP Partnership Agreement or applicable Law even if such revisions were to be given effect[.]

50.     In the highly unlikely event that a third party bidder is not deterred by the mere existence of such onerous terms unfairly benefiting SXL, and does provide a superior offer that ETP decides to pursue, the Partnership will be liable to SXL for a $630 million termination fee.

51.     These deal protections erect barriers to competing offers and virtually guarantee that the Proposed Transaction will be consummated, leaving ETP's unitholders with limited opportunity to consider any superior offer.  When viewed collectively, these provisions cannot be justified as reasonable or proportionate measures to protect ETP's investment in the transaction process.

52.     Moreover, pursuant to section 3.3(c) of the Merger Agreement only the affirmative vote or consent of a majority of ETP's outstanding units is required to consummate the Proposed Transaction, as opposed, for example, to a more fair provision that would require that a majority of the unaffiliated unitholders approve the Proposed Transaction.  And, ETE has agreed that it will vote its limited partner interests in ETP in favor of approval of the Proposed Transaction.

Inadequate Merger Consideration and Conflicts of Interest

53.     The value of ETP is materially greater than the consideration being offered in the Proposed Transaction.

54.     On November 21, 2016, an article was posted on the investing website, *Seeking Alpha*, titled "Sunoco Logistics Partners Has Advantage In Merger With Energy Transfer Partners."  The article, which states that "[e]ffectively, ETP unitholders are not receiving any premium based on the closing prices of the prior day," calls the Proposed Transaction "a significant dividend cut for ETP shareholders" that puts SXL unitholders "at an advantage."  However, as the article observes, the Proposed Transaction will likely be approved anyway

because "ETE, the parent company of both SXL and ETP, will be controlling the merger votes."
The article also states:

> Following the news of the merger, both SXL and ETP are selling off. SXL is currently down by 7.9% and ETP is down by 8.4%. I attribute the selloff to the fact that ETP shareholders will see a dividend cut by about 30%. ETP currently yields 10.7%; and once they convert into SXL shares, the effective dividend yield will become 7.8% - which is the yield paid by SXL - since there is no premium involved in the transaction. This is a significant dividend cut for ETP shareholders.  We should note, however, that this is positive for the combined entity as it will allow to significantly reduce its debt in the future.

> The way it looks, SXL shareholders are at an advantage here because they are likely to see their dividend grow at a faster pace going forward. ETP shareholders are at a disadvantage as they will see a dividend cut. I expect that the merger will go through anyway, because the ETE, the parent company of both SXL and ETP, is likely to be controlling the votes.

55.     Also on November 21, 2016, *Forbes* published an article titled "Is There Value In Sunoco Logistics' Merger With Energy Transfer Partners?"  The article states that the Proposed Transaction values ETP "lower than its $39.37 closing price this past Friday (the entities say the price represents a 10% premium over the target's average closing price over the last 30 days)," and "[i]nvestors don't think much of Sunoco Logistics Partners LP (NYSE:SXL)'s $20 billion purchase of affiliate Energy Transfer Partners LP (NYSE:ETP), and with good reason."

56.     According to *Bloomberg*, the analyst consensus estimate price for ETP units was $43.81 at the time the Proposed Transaction was announced, and at least one analyst had set a target price of $55 per unit.  A November 22, 2016 *Bloomberg* article titled "Energy Transfer and the Art of Transference" referred to the impact of the transaction on ETP unitholders as a "stealth dividend cut."  The article also reported:

> So ordinary investors in Energy Transfer Partners will get a stealth dividend cut instead. They will receive 1.5 units of Sunoco Logistics Partners for every unit they own. Sunoco Logistics Partners' quarterly dividend is just 51 cents per unit. Multiply that by 1.5, and Energy Transfer Partners' investors will see their quarterly payout drop from $1.06 to 77 cents -- a cut of 27 percent. Ouch.

* * *

This is backed up by the promise of synergies to offset their pain; $200 million a year by 2019 in this case. Here are three reasons why investors may roll their eyes at this:

First, recall that, during the twisty-turny phase of the Williams saga, Energy Transfer took the bold (Pythonesque?) step of trashing its own synergies estimates. (I'm guessing these latest ones will stand, though).

Second, even taken at face value, those synergies, discounted at 10 percent and assuming $100 million of upfront costs, are worth perhaps $2 per Energy Transfer Partners unit in today's money. That isn't much compensation, given the upfront $1.16 cut to annual dividends, which is much more tangible.

Third, more philosophically, if this sort of deal is required to reap synergies from the various bits of the Energy Transfer group, then what exactly is the benefit of the Energy Transfer group?

57.     The ETP Board failed to even attempt to maximize the value of the Proposed Transaction for the Partnership's unaffiliated unitholders.  As the Registration Statement admits:

In arriving at its opinion, Barclays [the financial advisor to the Board's Conflicts Committee] did not ascribe a specific range of values to the ETP common units or the SXL common units but rather made its determination as to fairness, from a financial point of view, to unaffiliated ETP unitholders of the exchange ratio to be offered to such unaffiliated ETP unitholders in the proposed transaction on the basis of various financial and comparative analyses.

58.     Even so, Barclays' Discounted Distributable Cash Flow Analysis, reflected a range of values for ETP common units showing that they could be worth as much as $46 per unit, notwithstanding the assumption that ETP distributions would be reduced.  This is approximately 20% more than the implied value of the consideration in the Proposed Transaction.  Likewise, the Selected Comparable Company Analysis conducted by Barclays provided a range of values for ETP units up to $45 per unit, more than 15% more than the consideration offered to ETP's unitholders.

59.     The consideration being offered to ETP unitholders in the Proposed Transaction also fails to adequately compensate the Partnership's unitholders for the significant synergies that will result from the Proposed Transaction.  For example, as disclosed in the Registration Statement, between 2017 and 2019, the pro forma impact of the Proposed Transaction is expected to be a reduction of up to 20.1% in distributable cash flow for ETP's unitholders and an increase of up to 10.5% increase for SXL unitholders.

60.     At the same time, ETP's officers and directors will be significantly enriched by the Proposed Transaction.  Their financial benefits, in addition to their opposing loyalties due to their duties to ETP, ETE, and SXL, make them hopelessly conflicted.  The Registration Statement acknowledges as much: "ETP's directors and executive officers have interests in the merger that are different from, or in addition to, the interests of ETP unitholders generally," including the fact that "[c]ertain members of the ETP Board are also members of the ETE board of directors and/or the SXL Board and are executives of ETE and/or ETP."

61.     Upon close of the Proposed Transaction, defendant Warren will become CEO of SXL, defendant McCrea will become Chief Commercial Officer of SXL, defendant Ramsey will become the President of SXL, and Long, current CFO of ETP, will become CFO of SXL.

62.     As of December 15, 2016, defendant Warren owned 21,167 ETP common units and 187,739,220 ETE common units; defendant Collins owned 113,537 ETP common units, 23,404 SXL common units and 344,532 ETE common units; defendant Grimm owned 26,016 ETP common units; defendant McCrea owned 351,710 ETP common units, 58,495 SXL common units, and 2,347,200 ETE common units, defendant Perry owned 10 ETP common units; defendant Ramsey owned 14,370 ETP common units and 53,331 ETE common units; and defendant Skidmore owned 10,530 ETP common units.

63.    Under the Merger Agreement, each ETP restricted unit held by the Individual Defendants will be converted into an SXL common unit, multiplied by the exchange ratio and rounded up to the nearest whole.   As of December 10, 2016, defendant McCrea had 227,240 outstanding ETP restricted units; defendant Ramsey had 77,190 outstanding ETP restricted units; defendant Collins had 6,600 outstanding ETP restricted units; defendant Grimm had 6,600 outstanding ETP restricted units; defendant Perry had 5,358 outstanding ETP restricted units; and defendant Skidmore had 7,176 outstanding ETP restricted units.

64.    As described in the *New York Times* article published on November 21, 2016 titled "Market Reaction to Deal May Bode Ill for Energy Transfer Partners":

> Energy Transfer Partners owns around a fifth of its would-be acquirer's common units — the equivalent of shares. It also exerts control over Sunoco through its 100 percent ownership of the general partner that staffs and runs Sunoco's pipelines. Sunoco lists itself as an Energy Transfer Partners subsidiary in its regulatory filings.
>
> Energy Transfer Equity, which had extreme buyer's remorse with Williams and was only able to get out of that $33 billion acquisition because of a legal loophole, controls Energy Transfer Partners through ownership of its general partner. Kelcy L. Warren, chief executive of Energy Transfer Equity, runs that company and Energy Transfer Partners. But he needs the approval of other Energy Transfer Partners unit holders for the Sunoco transaction to go through.

The Registration Statement Omits Material Information

65.    The Registration Statement omits material information regarding potential conflicts of interest of the Partnership's officers and directors.   Although defendants Warren, McCrea, Ramsey, and non-defendant Long will become officers of SXL after consummation of the Proposed Transaction, and the ETP Board members will serve as members of ETE's Board, the Registration Statement fails to disclose the timing and nature of all communications regarding future employment and directorship of ETP's officers and directors, including who participated in all such communications.

66.     The Registration Statement omits material information regarding ETP's and SXL's financial projections as follows:

(a)     With respect to ETP's projections, the Registration Statement fails to disclose: (i) a reconciliation of GAAP to non-GAAP metrics; (ii) stock-based compensation; (iii) the diluted units outstanding, as used in Barclays' analyses; (iv) "cash available to pay a unit's distribution expense," including a definition of the term; (v) expected synergies, as used in Barclays' analyses; (vi) revenues; (vii) income; (viii) net income; and (ix) expenses.

(b)     The Registration Statement fails to disclose whether the 15%-25% reduction in distributable cash flow applied uniformly over the three-year projection horizon, or whether specific reductions were applied in specific years; if the latter, the Registration Statement must disclose the year-by-year reductions and explain the reasons different reductions were applied in different years. The Registration Statement also fails to disclose the basis for such reductions.

(c)     With respect to SXL,' the Registration Statement fails to disclose all projected line items, including, but not limited to: (i) revenues; (ii) income; (iii) net income; and (iv) expenses.

(d)     The Registration Statement fails to disclose the schedule of the incentive distribution subsidies provided by, and projected to be provided by, ETE to each of ETP and SXL.

67.     The Registration Statement also omits material information about the financial analyses performed by Barclays in support of its fairness opinion, including the following:

(a)     With respect to Barclays' Discounted Distributable Cash Flow Analyses, the Registration Statement fails to disclose: (i) the definition and formula for distributable cash flows used by Barclays; (ii) the bases for the 1.1x coverage ratio assumption and hypothetical reductions in distributions; (iii) all assumptions underlying Barclays' estimate of ETP's cost of equity, as well as the basis for each assumption; (iv) the reasons Barclays deemed different terminal yields appropriate for ETP based on which projection scenario was being used; (v) the implied perpetuity growth rates for ETP corresponding to the assumed terminal yields; (vi) all assumptions underlying Barclays' estimate of SXL's cost of equity, as well as the basis for each assumption; (vii) the implied perpetuity growth rates for SXL corresponding to the assumed terminal yields; (viii) the reasons Barclays deemed it appropriate to base its terminal yields on the observed yields of the publicly traded peer companies given that the observed peer-company yields were forward yields (2017E and 2018E), whereas Barclays calculated ETP's terminal value using yields on a trailing basis; (ix) the discount rates applied to the ETP Status Quo Case and ETP Distribution Reduction Case, and whether the discount

rates were applied to estimated distributable cash flows and terminal values; and (x) the net present value date used for ETP.

(b)     With respect to Barclays' Selected Comparable Company Analysis, the Registration Statement fails to disclose: (i) an explanation of the following statement: "None of the MLPs that were selected for such purpose were subsequently excluded in conducting this analysis"; (ii) the observed company-by-company pricing multiples and financial metrics examined by Barclays; (iii) Barclays' basis for selecting different peer groups for ETP and SXL; and (iv) whether Barclays examined LTM yields.

(c)     With respect to Barclays' Selected Precedent Transactions Analysis, the Registration Statement fails to disclose: (i) the objective selection criteria and the observed transaction-by-transaction enterprise values, pricing multiples, transaction premiums, and financial metrics; (ii) the reasons EBITDA was chosen as the sole pricing multiple, while it was not used elsewhere in Barclays' analyses; (iii) the "differences between the characteristics" between this transaction and the precedent transactions perceived by Barclays, and how Barclays quantified the valuation impact of such differences; and (iv) the pricing multiples selected by Barclays for this analysis.

(d)     With respect to Barclays' Analysis of Equity Research Analyst Price Targets, the Registration Statement fails to disclose: (i) the overall number of price targets examined and detail each that was above the offer price; (ii) the source of the price targets; and (iii) the dates the price targets were issued.

(e)     With respect to Barclays' Pro Forma Merger Consequences Analysis, the Registration Statement fails to: (i) quantify the EBITDA and cash distributions from less-than wholly-owned subsidiaries; (ii) disclose the implied exchange ratios based on the Status Quo Case and how they differ from Barclays' other analyses; (iii) disclose discounted cash flow figures used in the analysis and underlying inputs and assumptions; and (iv) disclose the projected value of the post-close units.

(f)     The "Summary of Analyses" section of the Registration Statement fails to provide a valuation summary detailing the calculation of fully diluted shares, equity value (at the unaffected price and the offer), and enterprise value (at the unaffected price and the offer). If pricing multiples were calculated, that information must be disclosed as well.

68.     The Registration Statement omits material information regarding potential conflicts of interest of Barclays, financial advisor to the ETP Conflicts Committee.  In particular, the Registration Statement does not adequately disclose Barclays' ties to the parties to the Merger Agreement, including that Barclays is a large holder of SXL, ETP, and ETE units.

According to *Bloomberg*, but not disclosed in the Registration Statement, Barclays is the 19th largest holder of SXL out of 387 large holders. That position represents approximately 1.07% of the outstanding units of SXL and is larger than the combined common unit holdings of SXL's insiders. Further, and not disclosed in the Registration Statement, Barclays is the 34th largest holder of ETP units out of 679, and has a position equal to approximately 0.31% of outstanding units, a much larger position than the combined holdings of ETP common units by insiders. Finally, Barclays is also the 30th largest holder of ETE units out of 462, which position is equal to approximately 0.25% of ETE's outstanding units.

69.     The Registration Statement omits material information regarding the background of the Proposed Transaction. In particular, the Registration Statement discloses that defendants McCrea and Perry did not attend the board meeting at which the Proposed Transaction was agreed to, but it fails to disclose the reasons they did not to attend it.

70.     The Registration Statement also fails to disclose the reasons that, from November 22, 2016 to December 8, 2016, ETP, SXL, and their counsel "had various discussions regarding alternative structures for the proposed transaction, and in particular, the structure of the GP merger," and ultimately entered into the amended Merger Agreement.

71.     Having failed to maximize the sale price for ETP, the Individual Defendants have breached the fiduciary duties they owe to ETP's unitholders. The Partnership has been improperly valued and unitholders will likely not receive adequate or fair value for their ETP common units in the Proposed Transaction. Further, the Board failed to employ any real procedural protections for unitholders who had no one to bargain on their behalf, and has not made adequate disclosures of material information.

72.    Unless enjoined by this Court, the defendants will continue to breach and/or aid the breaches of fiduciary duties owed to plaintiff and the Class, and may consummate the Proposed Transaction to the irreparable harm of the Class.

73.    Plaintiff and the other members of the Class have no adequate remedy at law.

## CLASS ACTION ALLEGATIONS

74.    Plaintiff brings this action pursuant to Fed R. Civ. P. 23, on his own behalf and as a class action on behalf of the public holders of ETP common units (the "Class").  Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

75.    This action is properly maintainable as a class action.

76.    The Class is so numerous that joinder of all members is impracticable.  As of November 4 2015, there were approximately 542,668,309 publicly held units of ETP outstanding, held by hundreds of individuals and entities scattered throughout the country.

77.    Questions of law and fact are common to the Class, including, among others, whether defendants will irreparably harm plaintiff and the other members of the Class if defendants' conduct complained of herein continues.

78.    Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff has the same interests as the other members of the Class.  Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

79.    The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the

Class that would establish incompatible standards of conduct for defendants, or adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

80.     Defendants have acted, or refused to act, on grounds generally applicable to, and causing injury to, the Class and, therefore, final injunctive relief on behalf of the Class as a whole is appropriate.

## FIRST CAUSE OF ACTION

### Claim for Violation of Section 14(a) of the 1934 Act and Rule 14a-9 Against the Individual Defendants, ETP GP, ETP GP LLC, ETP, and ETE

81.     Plaintiff repeats and re-alleges each allegation set forth herein.

82.     The Individual Defendants, ETP GP, ETP GP LLC, ETP, and ETE disseminated the false and misleading Registration Statement, which, in violation of Section 14(a) of the 1934 Act and Rule 14a-9, contains statements that, in light of the circumstances under which they were made, omitted to state material facts necessary to make them not materially false or misleading.  The Individual Defendants, ETP GP, ETP GP LLC, ETP, and ETE are liable as the issuer of these statements.

83.     The Registration Statement was prepared, reviewed, and/or disseminated by the Individual Defendants. By virtue of their positions within the Partnership, the Individual Defendants were aware of this information and their duty to disclose this information in the Registration Statement.

84.     The Individual Defendants were at least negligent in filing the Registration Statement with these materially false and misleading statements.

85.     The omissions and false and misleading statements in the Registration Statement are material such that a reasonable unitholder would consider them important in deciding how to vote on the Proposed Transaction.   In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the total mix of information made available in the Registration Statement and in other information reasonably available to unitholders.

86.     The Registration Statement will be an essential link in causing plaintiff and the Partnership's unitholders to approve the Proposed Transaction, if it is approved.

87.     By reason of the foregoing, defendants violated Section 14(a) of the 1934 Act and Rule 14a-9 promulgated thereunder.

88.     Because of the false and misleading statements in the Registration Statement, plaintiff and the Class are threatened with irreparable harm.

## SECOND CAUSE OF ACTION

**Claim for Violation of Section 20(a) of the 1934 Act Against the Individual Defendants,
ETP GP, ETP GP LLC, SXL, SXL GP, and ETE**

89.     Plaintiff repeats and re-alleges each allegation set forth herein.

90.     The Individual Defendants, ETP GP, ETP GP LLC, SXL, SXL GP, and ETE acted as controlling persons of ETP within the meaning of Section 20(a) of the 1934 Act as alleged herein.   By virtue of their positions as officers and/or directors of ETP and participation in and/or awareness of the Partnership's operations and/or intimate knowledge of the false statements contained in the Registration Statement, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Partnership, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

91.     Each of Individual Defendants, ETP GP, ETP GP LLC, SXL, SXL GP, and ETE was provided with or had unlimited access to copies of the Registration Statement alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

92.     In particular, each of Individual Defendants, ETP GP, ETP GP LLC, and ETE had direct and supervisory involvement in the day-to-day operations of the Partnership, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same. The Registration Statement contains the unanimous recommendation of the Individual Defendants, ETP GP, ETP GP LLC, and ETE to approve the Proposed Transaction. They were thus directly in the making of the Registration Statement.

93.     SXL and SXL GP also had direct supervisory control over the composition of the Registration Statement and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Registration Statement.

94.     By virtue of the foregoing, the Individual Defendants and SXL violated Section 20(a) of the 1934 Act.

95.     As set forth above, Individual Defendants, ETP GP, ETP GP LLC, SXL, SXL GP, and ETE had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the 1934 Act and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act. As a direct and proximate result of defendants' conduct, plaintiff and the Class are threatened with irreparable harm.

## THIRD CAUSE OF ACTION

**Claim for Breach of the Covenant of Good Faith and/or Fiduciary Duties Against the Individual Defendants, ETP GP, ETP GP LLC, ETP, and ETE**

96.     Plaintiff repeats and re-alleges each allegation set forth herein.

97.     The Individual Defendants, ETP GP, ETP GP LLC, ETP, and ETE have violated the covenant of good faith and/or the fiduciary duties of care, loyalty, and good faith owed to the public unitholders of ETP.

98.     By the acts, transactions and courses of conduct alleged herein, the Individual Defendants, ETP GP, ETP GP LLC, ETP, and ETE individually and acting as a part of a common plan, are attempting to unfairly deprive plaintiff and other members of the Class of the true value of their investment in ETP.

99.     The Individual Defendants, ETP GP, ETP GP LLC, ETP, and ETE failed to exercise the care required, and breached their duties of loyalty, good faith, and independence owed to the unitholders of ETP.  The Individual Defendants, ETP GP, ETP GP LLC, ETP, and ETE failed to take reasonable steps to obtain and/or ensure that ETP unitholders receive adequate consideration and a reasonable premium for their units, agreed to restrictive deal protection devices that deter other suitors from making a superior bid for ETP, placed their personal financial interests ahead of those of ETP's unitholders, and caused to be filed with the SEC a materially incomplete and misleading Registration Statement concerning the Proposed Transaction to be filed with the SEC.

100.    The Individual Defendants, ETP GP, ETP GP LLC, ETP, and ETE, dominate and control the business and corporate affairs of ETP, and are in possession of private corporate information concerning ETP's assets, business and future prospects.  As a result, there exists an imbalance and disparity of knowledge and economic power between them and the public

unitholders of ETP which makes it inherently unfair for them to benefit their own interests to the exclusion of maximizing unitholder value.

101.    By reason of the acts, practices and course of conduct alleged herein, the Individual Defendants, ETP GP, ETP GP LLC, ETP, and ETE, have failed to exercise ordinary care and diligence in the exercise of their contractual and/or fiduciary obligations toward plaintiff and the other members of the Class.

102.    As a result of the actions of the Individual Defendants, ETP GP, ETP GP LLC, ETP, and ETE, plaintiff and the Class will suffer irreparable injury because they have not and will not receive their fair portion of the value of ETP's assets and businesses or a reasonable premium and have been and will be prevented from obtaining a fair price or reasonable premium for their units.

103.    Unless the Individual Defendants, ETP GP, ETP GP LLC, ETP, and ETE, are enjoined by the Court, they will continue to breach their contractual and/or fiduciary duties owed to plaintiff and the members of the Class, all to the irreparable harm of the members of the Class.

104.    Plaintiff and the members of the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can plaintiff and the Class be fully protected from the immediate and irreparable injury which the Individual Defendants' actions threaten to inflict.

## FOURTH CAUSE OF ACTION

### Claim for Breach of the Covenant of Good Faith and/or Fiduciary Duties Against SXL, and SXL GP

105.    Plaintiff repeats and re-alleges each allegation set forth herein.

106.    SXL and SXL GP have acted and are acting with knowledge of, or with reckless disregard to, the fact that the Individual Defendants, ETP GP, ETP GP LLC, ETP, and ETE are

in breach of the covenant of good faith and/or fiduciary duties to ETP's public unitholders, and have participated in such breaches of fiduciary duties.

107.    SXL and SXL GP knowingly aided and abetted the wrongdoing of the Individual Defendants, ETP GP, ETP GP LLC, ETP, and ETE alleged herein.  In so doing, they rendered substantial assistance in order to effectuate the plan of the Individual Defendants, ETP GP, ETP GP LLC, ETP, and ETE to consummate the Proposed Transaction in breach of the covenant of good faith and/or their fiduciary duties.

108.    As a result of the unlawful actions of SXL and SXL GP, plaintiff and the other members of the Class will be irreparably harmed because they will not receive the true and fair value for ETP's assets and business or a reasonable premium.  Unless their actions are enjoined by the Court, SXL and SXL GP will continue to aid and abet the breaches by the Individual Defendants, ETP GP, ETP GP LLC, ETP, and ETE of the covenant of good faith and/or fiduciary duties owed to plaintiff and the members of the Class.

109.    As a result of the conduct of SXL and SXL GP, plaintiff and the other members of the Class have been and will be damaged in that they have been and will be prevented from obtaining a fair and reasonable price or a reasonable premium for their ETP units.

110.    Plaintiff and other members of the Class have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands injunctive relief, in plaintiff's favor and in favor of the Class and against defendants, as follows:

A.    Declaring that this action is properly maintainable as a class action and certifying plaintiff as Class representative;

B.       Preliminarily and permanently enjoining defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Proposed Transaction, unless and until ETP adopts and implements a procedure or process to obtain the highest possible price for unitholders;

C.       In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

D.       Directing the Individual Defendants to disseminate a Registration Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

E.       Declaring that defendants violated Sections 14(a) and/or 20(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder;

F.       Directing defendants to account to plaintiff and the Class for all damages suffered by them as a result of defendants' wrongful conduct as alleged herein;

G.       Awarding plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

H.       Granting such other and further equitable relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED: January 26, 2017

BIGGS AND BATTAGLIA

By: */s/ Robert D. Goldberg*
Robert D. Goldberg, (Bar ID #631)
921 N. Orange St.
Wilmington, DE 19801
Telephone: (302) 655-9677
goldberg@batlaw.com

*Attorneys for Plaintiff*

OF COUNSEL

**HARWOOD FEFFER LLP**
Robert I. Harwood
Matthew M. Houston
Benjamin I. Sachs-Michaels
488 Madison Avenue
New York, NY 10022
Telephone: (212) 935-7400
Facsimile: (212) 753-3630